UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CHERRISH BISHOP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | No. 4:07CV1925 JCH/AGF |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Cherrish Bishop was not disabled,

as defined by the Social Security Act, and was thus, not entitled to child's disability

insurance benefits ("CDIB"), child's supplemental security income ("SSI"), or adult SSI.

The action was referred to the undersigned United States Magistrate Judge under 28

U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court

recommends that the decision of the Commissioner be affirmed.

On July 29, 2004, Plaintiff, who was born on July 28, 1988, was awarded child's

SSI for the closed period of August 27, 2002, until October 11, 2003, per her application,

due to attention deficit disorder ("ADD"). An Administrative Law Judge ("ALJ") found

that Plaintiff's ADD met the severity level of a deemed-disabling impairment listed in the Commissioner's regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"), because during the time period in question, she had marked limitations in acquiring and using information and in attending and completing tasks. The decision noted that after Plaintiff started taking Ritalin in January 2003, her symptoms improved. (Tr. at 72-76).[1]

In May and June 2006, Plaintiff, then just under 18 years old, filed new applications for CDIB, child's SSI, and adult SSI, claiming a disability onset date of December 1, 2002, due to a learning disability and attention deficit hyperactivity disorder ("ADHD"). Id. at 316. After her claims were denied at the initial administrative level, she requested an evidentiary hearing before an ALJ, and such a hearing was held on February 15, 2007, before the same ALJ who had ruled on Plaintiff's previous application. Plaintiff and her mother testified at the hearing.

On March 21, 2007, the ALJ issued two separate decisions -- one denying Plaintiff's claim for child's SSI ("Decision I"), and one denying Plaintiff's claim for CDIB and adult SSI ("Decision II"). Plaintiff requested review by the Appeals Council of the Social Security Administration and submitted new evidence in conjunction with that request. The request for review was denied on September 19, 2007. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decisions of March 21, 2007, stand

---

[1] The record indicates that Plaintiff was mistakenly paid these benefits, which should have stopped after December 2003, through June 2006, resulting in an overpayment of approximately $11,000. This matter is not relevant to the present case.

as the final agency actions now under review.

Plaintiff argues that the ALJ's decisions are not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ erred in finding in Decision I that Plaintiff's ADHD did not meet listing severity under the applicable functional equivalence test, and in failing to properly consider third-party evidence, particularly, the observations of Plaintiff's teachers. With respect to Decision II, Plaintiff argues that because the ALJ found that Plaintiff was limited to simple work, the testimony of a vocational expert ("VE") was required to support a conclusion that there was work Plaintiff could perform. Plaintiff also asserts that the new evidence submitted to the Appeals Council, indicating a diagnosis of major depressive disorder, was not properly considered. Lastly, Plaintiff argues that in both decisions, the ALJ failed to properly consider the subjective complaints of Plaintiff and her mother.

## School, Application, and Medical Records

Many of the records before the Court relate to Plaintiff's previous application for benefits. By way of background information, the results of a Wechsler Intelligence Scale for Children-III ("WISC-III") conducted on February 15, 2000, showed that Plaintiff had a verbal IQ of 78, a performance IQ of 74, and a full-scale IQ of 74. She scored 85 on a Comprehensive Test of Nonverbal Intelligence ("CTONI") conducted on December 3, 2003; and scored 84 on the Stanford-Binet Intelligence Scale (test date not indicated).

All of these scores indicate below average intelligence.  Id. at 477.[2]  Academic testing found Plaintiff's skills to fall within expected levels, based on her measured intelligence.  Id. at 482.  In 2000, and again on December 17, 2002, Special School District ("SSD") of St. Louis County, Missouri, determined that Plaintiff did not meet the state criteria for any educationally disabling condition.  Id. at 475, 482-86.

Plaintiff's cumulative grade point average in the 2004-2005 academic year was 1.96, ranking her 290 out of 337 students.  Id. at 337.  Her report card for the first semester of academic year 2005-2006 showed a grade of B in Academic Lab, D- in Desktop Publishing, D in English, C in Home Maintenance, F in Algebra I, F in Biology, and D- in World Civilization.  Id. at 330.

In a Work History Report completed on May 22, 2006, submitted by Plaintiff as part of her current applications for benefits, Plaintiff noted that she worked for two months during the summer of 2005 as a bagger in a grocery store, a job which she performed without any special accommodations and which she left when the school year started.  Id. at 382-87.  On a May 26, 2006 Function Report, Plaintiff wrote that she had a learning disability and that she was frustrated because her school work was too difficult for her.  She indicated that her impairment affected her memory and her ability to complete tasks, concentrate, and understand written instructions.  She also wrote that she

_____

[2]  WISC-III and Stanford-Binet IQ scores of 70-79 are in the borderline intelligence range, and scores of 80-89 are in the low average range. http://iq-test.learninginfo.org/iq04.htm.  CTONI composite scores of 35-69 are "very poor."

had difficulty with stress and change, and always thought that people were laughing at her because of her disability.  Id. 373-80.[3]

Plaintiff's mother submitted a statement dated May 26, 2006, stating that even with the extra help Plaintiff was receiving at school, she still found her school work too hard, and she had to go to summer school to be advanced to 11th grade.  Id. at 380.

A May 30, 2006 statement completed by Joe Boeckmann, Plaintiff's Biology teacher, indicated that Plaintiff was below average in reading, had a hard time focusing in class, got easily frustrated, and took a long time to finish assignments, possibly secondary to her poor reading skills.  Id. at 329.  In a letter dated May 31, 2006, Betty Ann Roberts, Plaintiff's World Civilization teacher and study-hall tutor during the 2005-2006 school year, observed that Plaintiff was a poor student who struggled with organization, writing assignments, following through on completion of assignments, and test preparation.  Ms. Roberts noted that Plaintiff took twice as long to complete an assignment as the average student, had trouble getting things from short-term memory to long-term memory, and was easily distracted.  Ms. Roberts further wrote that Plaintiff responded well to some study skills she taught her and did well on tests that required rote memorization, but still performed poorly on tests that required critical thinking.  Ms. Roberts believed that if Plaintiff could maintain a steady work pattern, develop and maintain good study habits, take tests in parts, be removed from as many distractions as possible, and develop good

---

[3]    The Court observes that Plaintiff's handwriting on this form is very legible and her comments are coherent and appropriate.

organizational skills, Plaintiff could be "as successful as her ability allowed." Id. at 328.

On July 7, 2006, state agency consultant L. Lynn Mades, Ph.D., examined Plaintiff in connection with Plaintiff's application for benefits. Dr. Mades observed that Plaintiff was overweight, cooperative, pleasant, and alert; that her ability to relate was coherent, relevant, and logical; that her mood was euthymic, with no apparent mood disturbance; that insight and judgment were fair; and that during the examination, Plaintiff showed the ability to maintain adequate attention and concentration, with appropriate persistence and pace. Dr. Mades diagnosed ADHD, predominantly inattentive type by history, and a Global Assessment of Functioning ("GAF") score of 75.[4] She believed that "with appropriate intervention," Plaintiff's prognosis was good. Id. at 403-06.

On July 18, 2006, non-examining consulting psychologist Judith McGee, Ph.D., completed a Childhood Disability Evaluation Form, which asked her to assess in check-box format whether Plaintiff had extreme, marked, less than marked, or no limitation in six domains of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and

_____

[4]   A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

manipulating objects, (5) caring for self, and (6) health and physical well-being.[5]  Dr.

McGee indicated that Plaintiff had less than marked limitations in acquiring and using

information, attending to and completing tasks, and caring for self; and no limitation in

the remaining domains.  She noted Plaintiff's WISC-III, CTONI, and Stanford-Benet

scores set forth above, but wrote that Plaintiff's IQ was in the average range.  Dr. McGee

also opined that records indicated a GAF score of 75, and that "[o]verall it appears the

claimant's limitations are not severe."  Id. at 366-71.

      Plaintiff's report card for the first semester of academic year 2006-2007 showed

C- in Academic Lab, D- in American Writers, C in Technical Theater, F in Spanish I, F in

Algebra I, D in Biology, and C- in History.  Id. at  336.  In the 2006-2007 academic year

Plaintiff's cumulative grade point average was 1.625 and her class rank was 309 of 335.

Id. at 337.

**Evidentiary Hearing of February 15, 2007** (Tr. at 24-46)

      Plaintiff, who was represented by counsel, testified that she was 18 years old, 5'

11" tall, and 210 pounds, having gained about 30 pounds in the past year.  Plaintiff lived

at home with her mother, brother, and stepfather, and was in the 11th grade.  She stated

that she was not receiving special education, but that she had received extra help with all

---

      [5]    As will be discussed later, a child is considered disabled under the
Commissioner's regulations, if she has marked limitations in two of these functional
domains, or extreme limitations in one of the domains.

of her subjects since the 8th grade in that the work was modified or made easier for her. Plaintiff testified that she had worked about 12 to 15 hours a week at a fast food restaurant for about five months, making sandwiches and cleaning, but had stopped working there a few days prior to the hearing because she believed the establishment was "unprofessional." Before that job, she worked 15 hours a week for one month, August 2005, at a supermarket bagging groceries.

When asked what medical problems prevented her from working, Plaintiff replied that her main problem was her inability to concentrate. She testified that she had been prescribed Concerta for this problem, but that she was no longer taking it because it caused her difficulty sleeping and she did not believe it helped her. The ALJ asked Plaintiff if she knew what "ADHD" was, and she answered that she heard of it but never knew its meaning. She said that having ADD made her feel "stupid." Plaintiff testified that she had difficulty at school with math (she did not understand multiplication, but could do addition and subtraction), science, and social studies. In the past year, her social studies teacher (Ms. Roberts) gave her one-on-one help, but Plaintiff still failed the course.

Plaintiff stated that she did not have any physical problems. She said that she visited with friends everyday after school, and that she had recently been in a school play with a speaking part of about four lines. She had no problem with her personal care, including dressing, bathing, and changing clothes, and she did chores around the house, including cleaning her room and washing dishes, and sometimes went grocery shopping

with her mother.  She said that she did not engage in outdoor activities, and that she got

approximately six hours of sleep per night.  She had a laptop computer on which she

played games and practiced math, and she also worked on the computers at school.

Plaintiff testified that she was not physically restricted and did not have a problem with

sitting, standing, or walking.

Plaintiff's mother acknowledged that Plaintiff was tested twice by SSD but did not

qualify for services.  Plaintiff however, had a learning disability and needed help.

Plaintiff was going to see Dr. Patel next month to determine whether she could be put

back on Concerta.  When asked about Plaintiff's other problems, Plaintiff's mother said

that Plaintiff cried a lot and had been through a lot.

**ALJ's Decision I - Child's SSI (Tr. at 14-21)**

The ALJ found that Plaintiff had never engaged in substantial gainful activity, and

that prior to attaining the age of 18, had the severe impairment of ADD.  He determined,

however, that she did not have a severe learning disability.  The ALJ noted that Plaintiff

had low average intelligence, but that this was not a medically determinable impairment.

He then concluded that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled any impairment listed in Appendix 1.

According to the ALJ, Plaintiff did not meet the listing for ADHD (Listing 112.11)

because there were no medically documented findings of marked inattention, marked

impulsiveness, and marked hyperactivity; and she did not meet the listing for mental

retardation (Listing 112.05) because her IQ scores were too high.[6]  Citing Plaintiff's testimony that she was not physically restricted, the ALJ determined that Plaintiff's obesity did not by itself, or in combination with other impairments, meet a listed impairment.

The ALJ then considered whether Plaintiff had an impairment that was functionally equivalent to the listings for retardation or ADHD, by assessing Plaintiff's abilities in the six domains of functioning noted above.[7]  He found that Plaintiff had less than marked limitation in all of the relevant domains, and that she, thus, did not have an impairment or combination of impairments as a child that functionally equaled a listed impairment.

In support of his finding that Plaintiff had a less than marked limitation in acquiring and using information, the ALJ stated that Plaintiff did not have documentation of mental retardation, borderline intellectual functioning, or a learning disability, and that although she struggled in school and received poor grades, testing showed low average intelligence and academic skills consistent with this intelligence.  He pointed to the two decisions by SSD that Plaintiff was not disabled.  In finding that Plaintiff had a less than marked limitation in attending and completing tasks, the ALJ stated that attention issues

---

[6]  Listing 112.05 requires, at a minimum, IQ scores under 71.

[7]  (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for self, and (6) health and physical well-being.

were interfering with Plaintiff's progress in school, but did not keep her from working, in that she was able to persist in one job for five months, and in another job before that. The ALJ also cited Dr. Mades's observation that during her examination of Plaintiff, Plaintiff maintained adequate attention and concentration, with appropriate persistence and pace.

The ALJ found it noteworthy that Plaintiff was able to work for months at a time, was twice found not disabled by SSD, was not eligible for special education, received "minimal" treatment, took no medication, and was age-appropriate in her activities of daily living and social functioning. He stated that he weighed these factors "against the allegations of disabling symptoms and limitations." The ALJ also found it noteworthy that Dr. McGee found no extreme or marked limitation in any of the relevant domains, and stated that for the period in issue there were no contrary assessments. In sum, the ALJ concluded that Plaintiff was not disabled from the time of her application through her attainment of the age of 18.

**ALJ's Decision II - CDIB and Adult SSI (Supp. Tr., Doc. #21-2)**

In this decision, the ALJ again found that Plaintiff's only severe impairment was ADHD, and that it was not of listing severity. He then proceeded to determine Plaintiff's residual functional capacity ("RFC"), and concluded that her only limitation was an inability to engage in complex or detailed work. In reaching this conclusion, the ALJ considered that Plaintiff had two not-disabled evaluations by SSD; her physical examinations were essentially unremarkable, except for her obesity which "was not

bothering her"; Dr. Mades found a GAF of 75 (in July 2006); Plaintiff's treatment for her

ADHD had been minimal, with no treatment documented in 2006 or thereafter; Plaintiff

had worked for five months at a sandwich shop and at a summer job in a grocery store,

jobs which did not end due to her impairments but which she quit of her own volition;

she had normal activities of daily living and social functioning, including going to school,

using a laptop, being in a play at school, and socializing with friends every day; and there

were no current reports from any medical source that Plaintiff could not work or was

disabled.

The ALJ concluded that, considering Plaintiff's age, education, work experience,

and unrestricted physical RFC, Plaintiff was not disabled under the Commissioner's

Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpart P, Appendix 2

("Guidelines").  The ALJ stated that the Guidelines take administrative notice of a

significant number of unskilled jobs at all exertional levels that a person such as Plaintiff

could perform.

**New Evidence Presented to Appeals Council and Appeals Council's Decision**

Plaintiff submitted new medical evidence to the Appeals Council -- psychiatric

treatment notes from April 5, 2007 (15 days after the ALJ's March 21, 2007 decisions)

and April 19, 2007.  These notes showed that on April 5, 2007, Plaintiff went to a

psychiatric clinic for an initial visit and was diagnosed with major depression recurrent,

possible ("rule out") ADHD/ADD, and a GAF score of 48.  Prozac was initiated.  When

Plaintiff was seen in follow-up on April 19, 2007, she was still looking "down."  Plaintiff

12

was to follow-up in two weeks and continue with Prozac.  Id. at 539-42.  In denying

Plaintiff's request for review, the Appeals Council summarily stated that the new

evidence submitted by Plaintiff did not provide a basis for changing the ALJ's decision.

Id. at 4-6.

## DISCUSSION

### Standard of Review

In reviewing the denial of Social Security disability benefits, a court must affirm

the Commissioner's decision so long as it "'complies with the relevant legal requirements

and is supported by substantial evidence in the record as a whole.'"  Pate-Fires v. Astrue,

564 F.3d 935, 942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir.

2008)).  "Substantial evidence is less than a preponderance, but is enough that a

reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.

(citation omitted).

In reviewing the record, the court "must consider both evidence that supports and

evidence that detracts from the Commissioner's decision."  Id.  Reversal is not warranted,

however, "as long as the ALJ's decision falls within the 'available zone of choice.'"

Bradley v. Astrue, 528 F.3d 113, 115 (2008) (citation omitted).  The decision of the ALJ

is not outside the 'zone of choice' simply because a reviewing court might have reached a

different conclusion had it been the initial trier of fact.  Id.  Rather, "if after reviewing the

record, the court finds it is possible to draw two inconsistent positions from the evidence

and one of those positions represents the ALJ's findings, the court must affirm the ALJ's

decision." Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (citation omitted).

Where the Appeals Council has considered new and material evidence and declined review, the court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000); Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000).

**Statutory and Regulatory Framework for CDIB and Child's SSI**

For a child under the age of 18 to be considered disabled and eligible for CDIB or child's SSI under the Social Security Act, she must have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner's regulations set out a three-step sequential evaluation process to determine whether a child's impairment or combination of impairments is disabling. The Commissioner begins by deciding whether the child is engaged in substantial gainful activity. If so, benefits are denied. If not, at step two, the child's impairment is evaluated to determine whether it is severe. If the child's impairment is not severe, there is no disability. If the impairment is severe, at step three the ALJ compares the impairment to the childhood listings in Appendix 1. If the child's impairment meets, medically equals, or functionally equals a listed impairment, the child is disabled. 20 C.F.R. § 416.924; Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

A child's impairment functionally equals a listed impairment if there is an

14

"extreme" limitation in one of the six functional domains noted above, or a "marked" limitation in at least two of the domains. 20 C.F.R. § 416.926a(b)(1); Hudson ex. rel Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003). A marked limitation is one that "interferes seriously" with the child's ability to independently initiate, sustain, or complete domain-related activities; an extreme limitation is one that "interferes very seriously" with these abilities. 20 C.F.R. § 416.926a(e)(2), (3). Not every activity in a domain must be markedly or extremely limited in order for the child's functioning in the domain as a whole to be considered so. Id.

In the domain of "acquiring and using information," the ALJ considers, inter alia, how well a child acquires, learns, and uses information. An adolescent child, like Plaintiff, should continue to demonstrate in middle and high school what she has learned in academic assignments. The child should be able to comprehend and express simple and complex ideas, using increasingly complex language in learning and daily living situations. The child should also learn to apply these skills in practical ways that will help her enter the workplace after finishing school. Id. § 416.926a(g)(2)(v).

In the domain of "attending and completing tasks," a child's ability to focus and maintain attention and to begin, carry through, and finish her activities, including the pace at which she does so and the ease with which she changes activities, is considered. An adolescent should be able to pay attention to increasingly longer presentations and discussions, maintain her concentration while reading textbooks, and independently plan and complete long-range academic projects. The child should also be able to organize

15

her materials and to plan her time in order to complete school tasks and assignments.  In anticipation of entering the workplace, the child should be able to maintain attention on a task for extended periods of time, and not be unduly distracted by peers or be unduly distracting to them in a school or work setting.  Id. § 416.926a(h)(2)(v).

**Statutory and Regulatory Framework for Adult SSI**

To be entitled to SSI, a low-income claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, establishing a five-step sequential evaluation process to determine adult disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 416.921(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment, or combination of impairments, is severe and meets the duration requirement, the Commissioner determines at step three

whether the claimant's impairment meets or is equal to any of the presumed-disabling impairments listed in Appendix 1. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If the claimant is able to perform her past relevant work, she is not disabled. If she cannot perform her past relevant work, or if she has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform other jobs that exist in significant numbers in the national economy, consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular exertional category of work (heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional abilities. Where a nonexertional impairment, such as a mental disorder, significantly limits the claimant's ability to perform the full range of work in a particular category, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE on the availability of jobs that a person with the claimant's RFC and vocational factors could perform. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006).

## ALJ's Findings Regarding Functional Equivalence

Plaintiff argues that the ALJ's determination that Plaintiff was not disabled prior to

attaining the age of 18 because she did not have impairments that functionally equaled a listing is not supported by substantial evidence on the record as a whole. She maintains that the ALJ did not properly weigh the observations of Plaintiff's teachers, Ms. Roberts and Mr. Boeckmann, and did not properly evaluate the credibility of Plaintiff and her mother.

The Commissioner's regulations for childhood disabilities provide that parents and teachers, as well as medical providers, are important sources of information. 20 C.F.R. § 416.924a; <u>Richardson ex rel. Richardson v. Massanari</u>, No. C00-2083 MJM, 2001 WL 34152093, *10 (N.D. Iowa Sept. 27, 2001) (explaining that under the Commissioner's regulations, "the observations and opinions of a child's teachers are particularly informative at [the functional equivalence] step due to the teachers' regular, ongoing interaction with, and observation of, the child over a sustained period of time").

Here, the only two domains in which Plaintiff could arguably be found to have had marked limitations as a child are the ability to acquire and use information, and the ability to attend to and complete tasks. Upon review of the record, the Court concludes that substantial evidence supports the ALJ's findings that Plaintiff did not have marked limitations in either of these areas. The ALJ properly relied upon the opinion of examining consultant Dr. Mades, who in July 2006 diagnosed Plaintiff with a GAF of 75, indicating that Plaintiff would have no more than a slight impairment in school functioning. The ALJ also noted Dr. Mades's observation that during her examination of Plaintiff, Plaintiff maintained adequate attention and concentration, with appropriate

18

persistence and pace. In addition, Plaintiff's minimal treatment for ADHD, with no

treatment documented in 2006 or thereafter, supports the ALJ's findings. See England v.

Astrue, 490 F.3d 1017, 1022 (8th Cir. 2007) (concluding that ALJ's decision that child

with ADHD lacked a marked impairment in acquiring and using information and

attending and completing tasks was supported by substantial evidence where school

assessments placed the child in the borderline range of overall intellectual functioning,

and in an average to low-average range with respect to more specific intellectual

functions, and child progressed through school while taking at least some general

education classes); M.C. ex rel. Carter v. Astrue, No. 4:07-CV-906 (CEJ), 2008 WL

3983072, at *8-9 (E.D. Mo. Aug. 25, 2008) (same with respect to a child diagnosed by

examining consultant with a GAF between 70 and 75, and who had a full IQ score of 76

on the WISC-IV); Pepper ex. rel Gardner, 342 F.3d at 855-56 (noting that fact that child

with ADHD was able to function in a normal classroom with resource assistance and did

not require a more restrictive educational environment supported ALJ's determination

that child was not markedly limited in these two domains).

Although the ALJ did not discuss Plaintiff's teachers' statements, that does not

mean that he did not consider them, and he was not required to credit the opinions of

Plaintiff's teachers over those of Dr. Mades. See England, 490 F.3d at 1022 (finding no

reversible error in the ALJ's failure to discuss teachers' reports that the child's limitations

in concentration, persistence, and pace were a "serious detriment to [her] school

success"). Further, here the statements in question do not establish that Plaintiff was

disabled under the standards for childhood disability.

Even though the Court believes that Plaintiff's school records could support a finding that Plaintiff suffers a marked limitation in these domains, the Court must still affirm the ALJ's decision because it is supported by substantial evidence, even if substantial evidence also supports a contrary outcome. See M.C. ex rel. Carter, 2008 WL 3983072, at *9 (citing Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001)).

With regard to Plaintiff's argument that the ALJ did not properly evaluate her credibility and that of her mother, in Polaski v. Heckler, 739 F.2d 1320, 1332 (8th Cir. 1984), the Eighth Circuit held that in evaluating the credibility of an individual's testimony and complaints, the ALJ must also consider such matters as the claimant's daily activities and functional restrictions. "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Dunahoo, 241 F.3d at 1038.

Here the ALJ properly relied on the fact that Plaintiff had worked successfully for five months (part-time while going to school) at the fast food restaurant job and did not leave the job due to her impairment. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (noting that the plaintiff's work for 24 hours a week in a certain year after her alleged disability onset date supported the ALJ's rejection of the plaintiff's subjective complaints of debilitating headaches and fatigue); 20 C.F.R. § 404.1571 (stating that working part-time during a period of alleged disability may demonstrate that a claimant is able to do more work than she actually did). The ALJ also properly relied on the fact that

SSD twice found that Plaintiff was not disabled and therefore not entitled to special education services.

In sum, a review of the ALJ's decisions shows that, in a manner consistent with Polaski, the ALJ considered Plaintiff's subjective complaints on the basis of the entire medical and academic record before him and had valid reasons for finding that Plaintiff's allegations that she was disabled as a child or adult not fully credible. Plaintiff's mother's testimony at the hearing, even if found fully credible, does not establish that Plaintiff was disabled under the relevant standards.

## ALJ's Failure to Obtain Testimony of a VE

Plaintiff maintains with regard to her entitlement to adult SSI that because the ALJ found that Plaintiff was limited to simple work, the testimony of a VE was required at step five of the evaluation process to determine whether there were jobs that Plaintiff could perform. The Court finds this argument unpersuasive in this case.

"'[T]he ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity. If the claimant's characteristics do not differ significantly from those contemplated in the Medical-Vocational Guidelines, the ALJ may rely on the Guidelines alone to direct a finding of disabled or not disabled.'" McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003) (quoting Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997)). The Guidelines "take administrative notice of the existence of numerous unskilled occupations within each of [the] exertional levels." Social Security Ruling 96-9p, 1996 WL 374185, at *2. This Court believes that, thus, the

ALJ was permitted to rely on the Guidelines at step five of the evaluation process.  See Guerrero v. Comm'r of Social Sec., 249 F. App'x 289, 293 (3d Cir. 2007) (holding that the ALJ properly relied on the Guidelines where the claimant was limited to unskilled jobs but was able to work at all exertional levels).

## New Evidence Submitted to the Appeals Council

Plaintiff argues that the new evidence submitted to the Appeals Council undermined the ALJ's RFC assessment.  The new evidence at issue is a diagnosis of major depressive disorder two weeks after the date of the ALJ's decision.  The Commissioner's regulations provide that the Appeals Council must consider "new and material evidence" that "relates to the period on or before the date of the [ALJ] hearing decision."  20 C.F.R. § 404.970(b).  Additional evidence submitted to the Appeals Council is material when it is "relevant to the claimant's condition for the time period for which benefits were denied."  Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)).

The Eighth Circuit interprets a statement by the Appeals Council that additional evidence "did not provide a basis for changing the ALJ's decision" as a finding that the evidence in question was not material.  Aulston v. Astrue, No. 07-1780, 2008 WL 2066019, at *1 (8th Cir. May 16, 2008) (citing Bergmann, 207 F.3d at 1069-70) (noting that whether additional evidence meets criteria of materiality is a question of law that courts review de novo)).

Here, Plaintiff did not allege depression in her prior or current applications for

benefits and did not raise depression at the evidentiary hearing. There is no evidence that she suffered from depression for a sufficient duration as to make it material to the ALJ's decision. Accordingly, the new evidence submitted to the Appeals Council does not provide a basis for reversing the ALJ's decision. See Riley v. Apfel, No. 98-3710, 1999 WL 758662, at *2 (8th Cir. Sept. 22, 1999) ("Because no issue of mental impairment was before the ALJ, we conclude that the additional materials [Plaintiff] submitted to the Appeals Council - including medical records showing a post-hearing prescription for an anti-anxiety medication, and letters in which she stated she had attempted suicide thirteen years earlier and sometimes thought of suicide again - were not new and material evidence."); Sullins v. Shalala, 25 F.3d 601, 604-05 (8th Cir. 1994) (holding that a psychiatric report with compelling evidence that the claimant suffered from a number of mental impairments, dated one month after the ALJ's decision, was too late to be considered where the claimant had not alleged depression as a disability in his applications or at the evidentiary hearing.) If Plaintiff's depression diagnosed on April 5, 2007, indeed persisted, her recourse is to file a new application for benefits, alleging an onset of disability after the date of the ALJ's decision in this case.

## CONCLUSION

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

The parties are advised that they have ten days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 19th day of August, 2009.